**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| COLTON LAUGHLIN, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEO COMMUNICATIONS US, LLC, and THE HERTZ CORPORATION,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Colton Laughlin ("Plaintiff"), individually and on behalf of all similarly situated persons, allege the following against Cleo Communications US, LLC ("Cleo") and The Hertz Corporation ("Hertz")(collectively "Defendants") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for its failure to properly secure and safeguard sensitive information of consumers and/or employees.

2. Defendant Cleo is a third-party vendor that provides software services to its clients, including Hertz.

3. Defendant Hertz is a rental car service company that serves hundreds of thousands of customers nationwide.

4. On or about April 11, 2025, Hertz filed official notice of a hacking incident with the Offices of the Attorney General in both Maine and California.

5. On or about April 11, 2025, Hertz also sent out data breach letters ("Notice Letter") to individuals whose information was compromised as a result of the hacking incident.

6. Based on the Notice Letter, on February 10, 2025, Defendant "confirmed that Hertz data was acquired by an unauthorized third party."[1] Hertz further stated that the unauthorized third party had gained access to the data in October 2024 and December 2024 by exploiting "zero-day vulnerabilities" within the platform of Cleo Communications US, LLC ("Cleo"), one of Defendant's vendors (the "Data Breach").[2]

7. The information compromised in the Data Breach includes the Plaintiff's and other similarly situated Hertz customers' and/or employees' personally identifiable information, including full names, dates of birth, credit card information, driver's license information, information related to worker's compensation claims, social security or other government identification numbers, passport information, ("PII") and protected health information. ("PHI")(collectively, "Private Information") from hackers.

8. According to Hertz's report to the Office of the Attorney General in Maine, approximately 3,409 individual Maine residents have been affected by the Data Breach, but the total number country wide has yet to be released.[3]

9. Plaintiff and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

---

[1] *See* Notice Letter https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2360 (last visited April 11, 2025).
[2] *Id.*
[3] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/342d0134-8941-4641-aa87-75b468bc6415.html (last visited April 11, 2025).

10. The Private Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves.

11. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12. There has been no assurance offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices sufficiently to avoid a similar breach of its network in the future.

13. Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

14. Plaintiff brings this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained.

15. The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus, Defendants were on notice that failing to take necessary steps to secure the Private Information left them vulnerable to an attack.

16. Upon information and belief, Defendants and their employees failed to properly monitor and implement security practices with regard to the computer network and systems that

housed the Private Information. Had Defendants properly monitored their networks effectively, they would have discovered the Data Breach sooner.

17. The Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct, as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties.

18. Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

19. Accordingly, Plaintiff, on behalf of themselves and the Class, asserts claims for negligence, negligence per se, breach of contract, breach of implied contract, unjust enrichment, declaratory judgment.

## PARTIES

20. Colton Laughlin is, and at all times mentioned herein was, an individual citizen of the state of Washington.

21. Defendant Cleo Communications US, LLC is incorporated under the laws of the state of Delaware by and through its sole member, Cleo Communications, Inc., a Delaware company. Defendant Cleo Communications US, LLC has its principal place of business located in Rockford, Illinois.

22. Defendant The Hertz Corporation is incorporated under the laws of the state of Delaware with its principal place of business located in Estero, Florida.

## JURISDICTION AND VENUE

23. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many

of whom have different citizenship from Hertz and Cleo. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

24. This Court has jurisdiction over Cleo through its business operations in this District, the specific nature of which occurs in this District. Cleo's principal place of business is in this District.

25. This Court has jurisdiction over Hertz because a substantial part of the events and omissions giving rise to this action occurred in this District, and Hertz intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Cleo's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

***Defendants' Businesses***

27. Defendant Cleo is a third-party vendor that provides software services to its clients, including The Hertz Corporation.

28. Defendant Hertz is a premier rental car service company with approximately 12,000 locations in more than 150 countries. Hertz employs more than 25,000 people and generates approximately $9 billion in annual revenue.[4]

29. Plaintiff and Class Members are current and former customers and/or employees at Cleo's clients, including Hertz.

30. In the course of their relationship, customers and employees at Cleo's clients, including Plaintiff and Class Members, provided Cleo with at least the following: names, Social

[4] *See* https://s204.q4cdn.com/384814028/files/doc_financials/2024/q4/Q4-2024-Earnings-Release-revised-Final.pdf (last visited April 11, 2025).

Security numbers, dates of birth, contact information, driver's license information, and other sensitive information.

31. Hertz uses this information, *inter alia*, for marketing, advertising, and business operations.

32. Upon information and belief, in the course of collecting Private Information from customers and employees, including Plaintiff, Defendants promised to provide adequate security for the data it collected from them through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

33. In its Notice Letter, Hertz states that "[w]e take the privacy and security of our customers' information seriously."[5] In its privacy policy, Hertz informs its customers that "[w]e use reasonable means to safeguard personal information under our control."[6]

34. Because of the highly sensitive and personal nature of the information Defendants acquires and stores with respect to its customers, Defendants, upon information and belief, promise to, among other things: keep customers' Private Information private; comply with industry standards related to data security and the maintenance of its customers' Private Information; inform its customers of its legal duties relating to data security and comply with all federal and state laws protecting customers' Private Information; only use and release customers' Private Information for reasons that relate to the services it provides; and provide adequate notice to customers if their Private Information is disclosed without authorization.

35. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should

---

[5] *See* Notice Letter.

[6] *See* https://www.hertz.com/rentacar/navigation/templates/privacyPolicyView.jsp? (last visited April 11, 2025).

have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

36. Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendant ultimately failed to do.

***The Data Breach and Hertz's Inadequate Notice to Plaintiff and Class Members***

37. According to Hertz's Notice, it learned of unauthorized access to Cleo's computer systems on February 10, 2025, with such unauthorized access having taken place in October 2024 and December 2024.

38. Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including credit card information, dates of birth, and social security numbers.

39. On or about April 11, 2025, Hertz began to notify customers that its investigation determined that their Private Information was obtained.

40. Hertz delivered Data Breach Notification Letters to Plaintiff and Class Members, alerting them that their highly sensitive Private Information had been exposed in a "data security incident."

41. The Notice Letter then attached several additional pages entitled "Kroll: Take Advantage of Your Identity Monitoring Services" and "Additional Resources," which listed generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Other than providing two years of identity monitoring services that Plaintiff and Class Members would have to affirmatively sign up for and a call center number that victims could contact "with any questions," Hertz offered no other substantive steps to help victims like Plaintiff and Class

Members to protect themselves. On information and belief, Hertz sent a similar generic letter to all individuals affected by the Data Breach.

42. Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

43. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

44. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

45. Defendants knew or should have known that its electronic records would be targeted by cybercriminals.

***Defendants Failed to Comply with FTC Guidelines***

46. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

47. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer

networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

48. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

49. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

50. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

51. Defendants were at all times fully aware of their obligation to protect the Private Information of its customers yet failed to do so. Defendants were also aware of the significant repercussions that would result from its failure to do so.

***Defendants Failed to Comply with Industry Standards***

52. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

53. Some industry best practices that should be implemented by businesses like Defendants include but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

54. Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

55. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

56. Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

***Defendants Breached their Duty to Safeguard Plaintiff's and Class Members' Private Information***

57. In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including complying with industry standards and requirements, training for their staff, and ensuring that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

58. Defendants breached their obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect customers' Private Information;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to sufficiently train their employees regarding the proper handling of their customers' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to industry standards for cybersecurity as discussed above; and

g. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

59. Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted Private Information.

60. Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

61. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Hertz.

***Defendants Should Have Known that Cybercriminals Target Private Information to Carry Out Fraud and Identity Theft***

62. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[7] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

---

[7] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on April 15, 2025).

63. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

64. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

65. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

66. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

67. One such example of this is the development of "Fullz" packages.

68. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

69. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information are being misused, and that such misuse is fairly traceable to the Data Breach.

70. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[8] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

---

[8] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited April 15, 2025).

71. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone fraud, bank fraud, or to obtain a driver's license or official identification card in the victim's name but with the thief's picture.

72. PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

73. The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[9] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry.

74. The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[10] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "Fullz" sold for $30 in 2017.[11]

75. Furthermore, even information such as names, email addresses and phone numbers can have value to a hacker. Beyond things like spamming customers, or launching phishing attacks

---

[9] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military (last visited on April 15, 2025).

[10] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited on April 15, 2025).

[11] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on April 15, 2025).

using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual. It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[12]

76. The Dark Web Price Index of 2022, published by PrivacyAffairs shows how valuable just email addresses alone can be, even when not associated with a financial account:[13]

| **Email Database Dumps** | **Avg. Price USD (2022)** |
|---|---|
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

77. Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails. If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

78. Likewise, the value of PII is increasingly evident in our digital economy. Many companies, including Hertz, collect PII for the purposes of data analytics and marketing. These companies collect it to better target customers and share it with third parties for similar purposes.[14]

---

[12] *See* https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on April 15, 2025).

[13] *See* https://www.privacyaffairs.com/dark-web-price-index-2022/ (last visited on April 15, 2025).

[14] *See* https://robinhood.com/us/en/support/articles/privacy-policy/ (last visited on April 15, 2025).

79. One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[15]

80. Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

81. A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

82. Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs their ability to participate in the economic marketplace.

83. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[15] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

> As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. [16]

84. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

85. As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

***Plaintiff Laughlin's Experience***

86. When Plaintiff Laughlin first became a customer, Hertz required Plaintiff Laughlin to provide it with substantial amounts of his Private Information.

87. On or about April 18, 2025, Plaintiff Laughlin received a letter entitled "Notice of Data Breach" which told him that his Private Information had been obtained during the Data Breach. The Notice Letter informed him that the Private Information compromised included his name, contact information, date of birth, driver's license information, and payment card information.

88. The Notice Letter offered Plaintiff Laughlin only two years of identity monitoring services. Two years of identity monitoring is insufficient given that Plaintiff Laughlin will now experience a lifetime of increased risk of identity theft and other forms of targeted fraudulent misuse of his Private Information.

---

[16] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/products/gao-07-737 (last visited April 15, 2025).

89. Plaintiff Laughlin suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his accounts for fraud.

90. Plaintiff Laughlin would not have provided his Private Information to Defendant had Defendant timely disclosed that their systems lacked adequate computer and data security practices to safeguard its customers' personal information from theft, and that those systems were subject to a data breach.

91. Plaintiff Laughlin suffered actual injury in the form of having his Private Information compromised and/or stolen as a result of the Data Breach.

92. Plaintiff Laughlin suffered actual injury in the form of damages to and diminution in the value of his personal and financial information – a form of intangible property that Plaintiff Laughlin entrusted to Hertz for the purpose of receiving rental car services from Hertz and which was compromised in, and as a result of, the Data Breach.

93. Plaintiff Laughlin suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

94. Plaintiff Laughlin has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

95. As a result of the Data Breach, Plaintiff Laughlin has encountered a significant uptick of spam communications, including unsolicited emails, calls, and text messages.

96. As a result of the Data Breach, Plaintiff Laughlin made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud,

blocking unsolicited communications, and researching the identity monitoring offered by Hertz, as well as long-term credit monitoring options he will now need to use. Plaintiff Laughlin has spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

97. Plaintiff Laughlin has suffered emotional distress as a result of the release of his Private Information to cybercriminals, which Private Information he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him. Plaintiff Laughlin is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on his life.

98. Plaintiff Laughlin also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of his Private Information, a form of property that Defendants obtained from Plaintiff Laughlin; (b) violation of his privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud he now faces.

99. As a result of the Data Breach, Plaintiff Laughlin anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

100. In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

101. Plaintiff and Class Members entrusted their Private Information to Hertz in order to receive Hertz's services.

102. Plaintiff's Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

103. As a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having credit card accounts opened in their names, and other forms of identity theft.

104. Further, as a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

105. Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

106. The Private Information maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

107. Plaintiff and Class Members also lost the benefit of the bargain they made with Hertz. Plaintiff and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiff and Class Members paid to Hertz was intended to be used by Hertz to fund adequate security of Hertz's system and protect Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class did not receive what they paid for.

108. Additionally, as a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

109. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

110. Additionally, Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for private information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[17] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can, in turn, receive up to $50 a year.[18]

111. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and

---

[17] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited April 15, 2025).

[18] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited April 15, 2025).

the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

112. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. The contractual bargain entered into between Plaintiff and Hertz included Hertz's contractual obligation to provide adequate data security, which Hertz failed to provide. Thus, Plaintiff and Class Members did not get what they bargained for.

113. Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

a. Monitoring for and discovering fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Addressing their inability to withdraw funds linked to compromised accounts;

d. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

e. Contacting financial institutions and closing or modifying financial accounts;

f. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

g. Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

114. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future additional breaches by the implementation of more adequate data security measures and

safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

115. As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## CLASS ACTION ALLEGATIONS

116. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

117. Specifically, Plaintiff proposes the following Class, subject to amendment as appropriate:

> All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach on or about April 11, 2025.

118. Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned, as well as their judicial staff and immediate family members.

119. Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

120. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

121. Numerosity. The Class Members are so numerous that the joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this

time, based on information and belief, the Class consists of current and former customers of Hertz whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

122. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. When Defendants learned of the Data Breach;

c. Whether Defendants' response to the Data Breach was adequate;

d. Whether Defendants unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

e. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

i. Whether Defendants breached their duty to Class Members to safeguard their Private Information;

j. Whether hackers obtained Class Members' Private Information via the Data Breach;

k. Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

l. Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

m. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

n. What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

o. Whether Defendants' conduct was negligent;

p. Whether Defendants' conduct was *per se* negligent;

q. Whether Defendants were unjustly enriched;

r. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

123. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

124. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

125. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of the judicial economy.

126. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would, therefore, have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

127. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

128. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Hertz.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

129. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-128 as if fully set forth herein.

130. Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

131. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

132. Defendants owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA and California and Florida consumer protection laws;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

133. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

134. Defendants' duty also arose because Defendants were bound by industry standards to protect their customers' confidential Private Information.

135. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

136. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendants' possession.

137. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

138. Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

139. Defendants breached their duties, and thus, was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

140. Hertz had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Hertz with their Private Information was predicated on the understanding that Hertz would take adequate security precautions. Only Defendants had the ability to protect their systems (and the Private Information that it stored on them) from attack.

141. Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated as alleged herein.

142. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

143. As a result of Defendants' negligence in breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

144. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

145. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

146. The injury and harm that Plaintiff and Class Members suffered were reasonably foreseeable.

147. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

148. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
## (On behalf of Plaintiff and the Class)

149. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-128 as if fully set forth herein.

150. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

151. Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

152. Plaintiff and Class Members are within the class of persons that the FTCA is intended to protect.

153. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Hertz's duty in this regard.

154. Defendants violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

155. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Hertz's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

156. Defendants' violations of the FTCA constitute negligence *per se*.

157. Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

158. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

159. Defendants breached their duties to Plaintiff and the Class under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

160. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

161. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT III
## BREACH OF CONTRACT
## (On behalf of Plaintiff and the Class)

162. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-128 as if fully set forth herein.

163. Plaintiff and Class Members entered into a valid and enforceable contract through which they paid money to Hertz in exchange for services. That contract included promises by

Defendants to secure, safeguard, and not disclose Plaintiff's and Class Members' Private Information.

164. Hertz's Privacy Policy memorialized the rights and obligations of Hertz and its customers. This document was provided to Plaintiff and Class Members in a manner in which it became part of the agreement for services.

165. In its Notice Letter and Privacy Policy, Hertz commits to protecting the privacy and security of its customers' private information.

166. Plaintiff and Class Members fully performed their obligations under their contracts with Hertz.

167. However, Defendants did not secure, safeguard, and/or keep private Plaintiff's and Class Members' Private Information, and therefore Hertz breached its contracts with Plaintiff and Class Members.

168. Defendants allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class Members' Private Information without permission. Therefore, Hertz breached the Privacy Policy with Plaintiff and Class Members.

169. Hertz's failure to satisfy its confidentiality and privacy obligations resulted in Hertz providing services to Plaintiff and Class Members that were of diminished value.

170. As a result, Plaintiff and Class Members have been harmed, damaged, and/or injured as described herein, including in Hertz's failure to fully perform its part of the bargain with Plaintiff and Class Members.

171. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

172. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Class)

173. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-128 as if fully set forth herein.

174. This Count is pleaded in the alternative to Count III above.

175. Hertz provides rental car services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Hertz regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for services from Hertz.

176. Through Hertz's sale of services, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with Hertz's policies, practices, and applicable law.

177. As consideration, Plaintiff and Class Members paid money to Hertz and turned over valuable Private Information to Hertz. Accordingly, Plaintiff and Class Members bargained with Hertz to securely maintain and store their Private Information.

178. Hertz accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

179. In delivering their Private Information to Hertz and paying for services, Plaintiff and Class Members intended and understood that Defendants would adequately safeguard the Private Information as part of that service.

180. Hertz's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protects the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

181. Plaintiff and Class Members would not have entrusted their Private Information to Hertz in the absence of such an implied contract.

182. Had Hertz disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Hertz.

183. Hertz recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

184. Hertz violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

185. Plaintiff and Class Members have been damaged by Hertz's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## COUNT V
## UNJUST ENRICHMENT
## (On behalf of Plaintiff and the Class)

186. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-128 as if fully set forth herein.

187. This Count is pleaded in the alternative to Counts III and IV above.

188. Plaintiff and Class Members conferred a benefit on Defendants by turning over their Private Information to Defendant and by paying for services that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

189. Upon information and belief, Hertz funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

190. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Hertz.

191. Hertz has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

192. Hertz knew that Plaintiff and Class Members conferred a benefit upon it, which Hertz accepted. Hertz profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

193. If Plaintiff and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Hertz.

194. Due to Hertz's conduct alleged herein, it would be unjust and inequitable under the circumstances for Hertz to be permitted to retain the benefit of its wrongful conduct.

195. As a direct and proximate result of Hertz's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

196. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Hertz and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Hertz from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

197. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VI**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiff and the Class)**

198. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-128 as if fully set forth herein.

199. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

200. Defendants owe a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

201. Defendants still possess the Private Information of Plaintiff and Class Members.

202. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff continue to suffer injury as a result of the compromise of their Private Information, and the risk remains that further compromises of their Private Information will occur in the future.

203. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure their customers' Private Information and to timely notify customers of a data breach under the common law and Section 5 of the FTCA;

b. Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect customers' Private Information; and

c. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

204. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect customers' Private Information, including the following:

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps Hertz's customers should take to protect themselves.

205. If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Hertz. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

206. The hardship to Plaintiff, if an injunction is not issued, exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

207. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach, thus

preventing future injury to Plaintiff and other customers whose Private Information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Classes described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff are proper representatives of the Nationwide Class, and the State Subclasses requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

DATED: April 21, 2025

Respectfully submitted,

*/s/ M. Anderson Berry*
M. Anderson Berry

M. Anderson Berry
Gregory Haroutunian*
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
*aberry@justice4you.com*
*gharoutunian@justice4you.com*

Timothy W. Emery*
Patrick B. Reddy*
**EMERY REDDY, PLLC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106
Fax: (206) 441-9711
*emeryt@emeryreddy.com*
*reddyp@emeryreddy.com*

**Pro Hac Vice Forthcoming*